# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LORIE R. BOWERS                    :
           **Plaintiff**    :
    v.                            :     **3:CV-03-1137**
                      :     **(JUDGE VANASKIE)**

FOTO-WEAR, INC., DONALD S. HARE,    :
TROY SECHRIST, LORRAINE L. HARE,    :
PAUL D. JETTER, MARK S. SAWCHAK,    :
Each Individually and as an Officer of    :
Foto-Wear, Inc.                    :
           **Defendants**    :

## MEMORANDUM

Plaintiff Lorie Bowers initiated this action against her former employer, Foto-Wear, Inc., and its officers, claiming that the company breached its employment contract with her by failing to pay her monies due under that agreement.  In addition to her breach of contract claim, Ms. Bowers also asserts that Foto-Wear and its officers: (1) violated the Pennsylvania Wage Payment and Collection Law (the "WPCL"), 43 Pa. Cons. Stat. Ann. § 260.1, *et seq.*, by failing to pay her commission and benefits due at termination; (2) violated the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 201, *et seq.*, and the Pennsylvania Minimum Wage Act (the "Pa. MWA"), 43 Pa. Cons. Stat. Ann. § 333.102, *et seq.*, by failing to pay her overtime wages; (3) unlawfully retaliated against her for making complaints about Defendants' noncompliance with wage laws; and (4) violated the New Jersey Conscientious Employee Protection Act (the "CEPA"), N.J. Stat. Ann. 34:19-1, *et seq.*, by terminating her employment in response to her complaints about Defendants' noncompliance with wage laws.  (Am. Compl. (Dkt. Entry 27).)

Ms. Bowers has moved for summary judgment on the breach of contract and WPCL

claims.  Defendants cross-filed a motion for summary judgment on all of Ms. Bowers' claims.

Because I find the terms of Ms. Bowers' employment contract ambiguous, I will deny both

parties' motions for summary judgment on the breach of contract claim.  As to the WPCL claim,

I find that there is an issue of fact as to whether Ms. Bowers had "earned" the commission that

was otherwise payable under the employment contract with Foto-Wear two months after Foto-

Wear severed the employment relationship.[1]  For reasons stated below, I will grant Defendants'

motion for summary judgment on Ms. Bowers' FLSA, Pa. MWA, CEPA, and retaliation claims.

## I.  BACKGROUND

### A.  Factual Background

Foto-Wear is a Pennsylvania corporation in the business of making and selling transfer

paper that allows printed images to be transferred onto clothing, such as T-shirts.  (Pl.'s

Statement of Material Facts ("SMF") (Dkt. Entry 66) ¶ 27.[2])  In early 2001, Foto-Wear offered to

hire Ms. Bowers as its Director of Marketing and Business Development.  (Id. ¶¶ 30-35.)

Following detailed negotiations, Ms. Bowers and Foto-Wear's President and Chief Executive

---

[1]  I will, however, dismiss the WPCL claims against Lorraine Hare, Paul Jetter and Mark Sawchak, finding no evidence that they acted in a capacity that would expose them to personal liability for the failure to pay wages.

[2]  Citation to the Plaintiff's or Defendants' Statement of Material Facts signifies that the other party admitted the asserted fact without qualifications.  Where either's response to a particular assertion of fact qualifies that assertion in a material way, citation is made to both Plaintiff's and Defendants' Statements of Material Facts.

Officer ("CEO"), D. Troy Sechrist, executed an employment contract on March 15, 2001.  (Id. ¶¶ 3, 36; <u>see also</u> Employment Contract, Pl.'s Mot. Summ. J. Ex. 3 (Dkt. Entry 68).)

Article III of the employment contract set forth the following terms for Ms. Bowers' employment:

> ARTICLE III: TERMS.  The Company hereby employs the Employee, and the Employee hereby accepts employment for a term of two (2) years from the date thereof.  <u>The company may terminate this contract for cause within the term of the contract</u> discussed above.  <u>In absence of cause, this contract shall bind the company to pay the employee the full two-year (2) term of this contract</u> unless the employee terminates the contract voluntarily. In the event that the employee terminates this contact prior to its full term as discussed above, the employee is precluded from working for any customer of the company for the full term of the contract.  If it is determined that the employee has breached this provision of the agreement after voluntarily terminating the contract prior to its original full term then the company may seek to recoup any monies paid to the employee during the employees' term of employment with the company.  Such notice of termination shall not prejudice either party as to any remedies under the provisions of this agreement.  If the agreement is not terminated by either party during the initial term hereof, the Employee's employment shall continue thereafter under the terms and conditions hereof for a period of one year, and so on from year to year, until either party terminates this agreement.

(Employment Contract, Pl.'s Mot. Summ. J. Ex. 3 (Dkt. Entry 68) art. III (emphasis added).)

As compensation for her services, Ms. Bowers was to receive a base salary of $130,000 per year, a car allowance, a housing allowance, four (4) weeks paid vacation per calender year, and permission to participate in the company's 401(k) plan.  (Id. art. IV.)  The contract also

provided for the following commission compensation:

> f.) commission in an amount to be determined pursuant to the Schedule(s) of Commissions which is attached to this agreement. These commissions will be paid quarterly on the following dates April 15, July 15, October 15 and January 15.  The payments referenced in the preceding sentence shall be for the prior 3 month period immediately preceding the month of payment beginning on the 1st day of the 1st month and ending on the last day of the 3rd month.

(Id.)   The attached schedule dictated that Ms. Bowers receive a commission of ½% of all original equipment manufacturer[3] sales exceeding a certain threshold.  (Id. at 14.)

One week after executing the employment contract, on March 22, 2001, Ms. Bowers and Mr. Sechrist executed a "Replacement Commission Schedule."  (Replacement Commission Schedule, Pl.'s Mot. Summ. J. Ex. 4 (Dkt. Entry 68).)  The schedule explicitly replaced the previous commission schedule and Article IV, section (f) of the employment contract.  (Id.)  The replacement schedule stated that Ms. Bowers:

> shall receive a commission paid annually on the anniversary date of employment (for purposes of this agreement, March 13, 2002 and March 13, 2003).  For the first year of this agreement, Employee shall receive a commission of ½% of all sales over and above $6,000,000 with minimum total compensation (base salary plus commission) of $185,000 and a cap of $225,000.

-----

[3]  Original equipment manufacturer "is a term that refers to a situation in which one company purchases a manufactured product from another company and resells the product as its own, usually as a part of a larger product the original company is selling."  Wikipedia, Original Equipment Manufacturer, at http://en.wikipedia.org/wiki/Original_equipment_manufacturer (last visited Mar. 21, 2007).

> For the second year of this agreement, Employee shall receive a commission of ½% of all sales with a minimum total compensation (base salary plus commission) of $225,000, which in this case shall also equal the ceiling or cap.

(Id.)

Ms. Bowers did not receive a commission payment on March 13, 2002, as she expected under the replacement commission schedule.  (Pl.'s SMF (Dkt. Entry 66) ¶ 70.)  Ms. Bowers apprised Foto-Wear that she believed it was contractually obligated to pay her a commission of $55,000.[4]  (Id. ¶ 71)  She also notified Foto-Wear that it was required to pay her commission under the WPCL.  (Id.)  Foto-Wear subsequently paid Ms. Bowers $55,000 plus $2,500 in "interest" over five months.  (Id.; Dep. Tr. of Emil Calomino, Pl.'s Mot. Summ. J. Ex. 15 (Dkt. Entry 68-3) at 24; Defs.' SMF (Dkt. Entry 80) ¶ 71).)

By December 2002, Mr. Sechrist realized that Foto-Wear was in a poor financial position and attempted "to cut costs to keep Foto-Wear viable and strong."  (Dep. Tr. of D. Troy Sechrist, Pl.'s Mot. Summ. J. Ex. 11 (Dkt. Entry 68-2) at 38, 41.)  Mr. Sechrist notified Ms. Bowers regarding Foto-Wear's financial position and asked if she would reduce her compensation.  (Defs.' SMF (Dkt. Entry 80) ¶ 73.)  Ms. Bowers refused to alter the terms of her

---

[4]  According to the replacement commission schedule, Ms. Bowers was to "receive a commission of 1/2% of all sales over and above $6,000,000 with minimum total compensation (base salary plus commission) of $185,000 and a cap of $225,000."  (Replacement Commission Schedule, Pl.'s Mot. Summ. J. Ex. 4 (Dkt. Entry 68).)  The $55,000 commission payment represents the difference between the $185,000 minimum total compensation and Ms. Bowers' base salary of $130,000.

employment contract.  (Pl.'s SMF (Dkt. Entry 19) ¶ 73.)

On January 9, 2003, Mr. Sechrist sent Ms. Bowers a "Notice of Employee Termination."

(Pl.'s Mot. Summ. J. Ex. 2 (Dkt. Entry 68).)  In the notice, Mr. Sechrist stated:

> It is with mixed emotions that I write this letter to you today.  You have put forth a great effort since your arrival. . . .
>
> Unfortunately, we were unable to come to terms to renegotiate your contract as part of the overall Foto-Wear reorganization plan made effective this week.  An offer was made to buy out the remainder of your contract for $60,000, paid in equal installments of $10,000 over a period of six months.  After multiple conversations earlier this week, you expressed your strong preference and need to remain at full salary through the term of your Employment Contract.  Though Foto-Wear no longer requires your presence or services, Foto-Wear will honor its commitment to pay your base salary of $130,000 via bi-weekly payments in conjunction with payroll, along with benefits through March 13, 2003.

(Id.)

Ms. Bowers advised Foto-Wear that it was obligated to pay her all monies due under her

two-year employment contract.  (Bowers Aff., Pl.'s Mot. Summ. J. Ex. 1 (Dkt. Entry 68) at ¶ 54.)

Ms. Bowers offered to continue soliciting sales for Foto-Wear through the end of her contract.

(Pl.'s SMF (Dkt. Entry 66) ¶ 75.)  Foto-Wear did not continue to employ Ms. Bowers.  (Id.)

Foto-Wear paid Ms. Bowers her remaining base salary though March 2003.  (Pl.'s SMF

(Dkt. Entry 66) ¶ 76.)  Other than her base salary, Ms. Bowers did not receive any other

compensation after January 9, 2003.  (Id. ¶ 77.)

### B.  Procedural Background

Ms. Bowers filed a five-count complaint in this Court on July 9, 2003.  (Dkt. Entry 1.)

She amended her complaint on May 19, 2004, adding a sixth count.  (Dkt. Entry 27.)  In

addition to Foto-Wear, Ms. Bowers named the following Foto-Wear officers as defendants:

Donald Hare (Chairman of the Board), D. Troy Sechrist (President and C.E.O. during Ms.

Bowers' employment), Lorraine Hare (Secretary), Paul D. Jetter (Vice President), and Mark

Sawchak (Foto-Wear's current President) (collectively, the "Officer Defendants").

In count one, Ms. Bowers asserts that Foto-Wear breached its contractual obligation to

Ms. Bowers by terminating her employment and not paying her "all commissions due plus all

accrued benefits."  (Id. ¶¶ 29-33.)  In count two, Ms. Bowers claims Foto-Wear and Officer

Defendants violated the WPCL by failing to pay her commission and benefits due to her.  (Id.

¶¶ 34-41.)  In counts three and four, Ms. Bowers asserts that Foto-Wear and Officer

Defendants violated the FLSA and the Pa. MWA, respectively, for failing to pay her overtime

wages.  (Id. ¶¶ 42-59.)  In count five, Ms. Bowers claims that Foto-Wear, Mr. Hare, Mr.

Sechrist, and Mr. Sawchak unlawfully retaliated against her by terminating her employment for

asserting her rights under the WPCL.  (Id. ¶¶ 60-70.)  In count six, Ms. Bowers asserts that

Foto-Wear, Mr. Hare, Mr. Sechrist, and Mr. Sawchak violated the CEPA by violating her

employment agreement and retaliating against her for asserting her rights.  (Id. ¶¶ 71-72.)

On June 9, 2004, Defendants moved to dismiss Counts two through six of Ms. Bowers'

7

amended complaint.  (Dkt. Entry 32.)  The Court denied Defendants' motion to dismiss on

August 31, 2005.  (Dkt. Entry 63.)

Ms. Bowers moved for partial summary judgment on September 9, 2005, claiming that

she is entitled to judgment as a matter of law on the issues of liability and damages under count

one and liability under count two.  (Dkt. Entry 64.)  Defendants filed a cross-motion for

summary judgment on all counts on November 15, 2005.  (Dkt. Entry 79.)  The motions have

been fully briefed, and oral argument was heard on June 2, 2006.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Summary judgment should be granted when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a

matter of law."  FED. R. CIV. P. 56(c).  A fact is "material" if proof of its existence or non-

existence might affect the outcome of the suit under applicable law.  Anderson v. Liberty Lobby

Inc., 477 U.S. 242, 248 (1986).  "Facts that could alter the outcome are material facts."

Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 197 (3d Cir. 1994).  "[S]ummary judgment will

not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

Initially, the moving party must show the absence of a genuine issue concerning any

material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  All doubts as to the

existence of a genuine issue of material fact must be resolved against the moving party, and

the entire record must be examined in the light most favorable to the nonmoving party.  White

v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988).  Once the moving party has

satisfied its burden, the nonmoving party "must present affirmative evidence in order to defeat a

properly supported motion for summary judgment."  Anderson, 477 U.S. at 257.  Mere

conclusory allegations or denials taken from the pleadings are insufficient to withstand a motion

for summary judgment once the moving party has presented evidentiary materials.  Schoch v.

First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).  Rule 56 requires the entry of

summary judgment if there was adequate time for discovery and a party "fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

### B.  Count I - Breach of Contract[5]

Both parties have moved for summary judgment on Ms. Bowers' breach of contract

claim.  According to Ms. Bowers, Foto-Wear breached the terms of the employment contract by

prematurely terminating her employment without cause and by subsequently failing to pay her

---

[5]  The parties agree that interpretation of Ms. Bowers' employment contract is governed
by New Jersey law in accordance with the contract's choice of law provision.  (See Employment
Contract, Pl.'s Mot. Summ. J. Ex. 3 (Dkt. Entry 68) art. X para. 3.)

non-salary compensation.[6]  Foto-Wear contends that its poor financial position constituted

cause for terminating Ms. Bowers' employment.[7]

Adjudication of contract claims by summary judgment is appropriate when the terms of a

written agreement are not ambiguous.  Kaufman v. Provident Life and Cas. Ins. Co., 828 F.

Supp. 275, 282 (D.N.J. 1992); Nester v. O'Donnell, 693 A.2d 1214, 1220 (N.J. Super. Ct. App.

Div. 1997).  If, however, the terms of a written agreement are uncertain or ambiguous, then "the

meaning of the doubtful provisions should be left to the jury."  Michaels v. Brookchester, Inc.,

140 A.2d 199, 204 (N.J. 1958).  A term is ambiguous if, after applying established rules of

interpretation, the written contract remains "susceptible to at least two reasonable alternative

interpretations."  Kaufman, 828 F. Supp at 282.  Under New Jersey's "expansive" view of

contract interpretation, courts are to "consider all of the relevant evidence that will assist in

determining the intent and meaning of the contract."  Conway v. 287 Corporate Center

Associates, 901 A.2d 341, 346 (N.J. 2006).  Indeed, New Jersey courts permit "a broad use of

_____

[6]  There is no factual dispute that Foto-Wear did not pay Ms. Bowers her commission or benefits after January 9, 2003.

[7]  Defendants suggest that Ms. Bowers could have been terminated for breaching company policy based on a troubling confrontation she had with another Foto-Wear employee. (See Defs.' SMF (Dkt. Entry 80) ¶¶ 55-57.)  There is no evidence, however, that Foto-Wear did fire Ms. Bowers because of this confrontation.  Instead, the evidence is consistent that Foto-Wear fired Ms. Bowers because of financial hardship.

extrinsic evidence" to "uncover the true meaning of contractual terms."[8]  Id. at 347.

Under the terms of Ms. Bowers' employment contract, Foto-Wear could terminate the contract before March 13, 2003 only "for cause."   (Employment Contract, Pl.'s Mot. Summ. J. Ex. 3 (Dkt. Entry 68) art. III.)   The employment contract does not expressly define "cause" for terminating the agreement.   The contract does, however, set forth the following "events" that would terminate the contract:

> (1) The death of Ms. Bowers;
> (2) Ms. Bowers becomes disabled;
> (3) Ms. Bowers violates the employment handbook or incurs liability for Foto-Wear;
> (4) Ms. Bowers violates any of the provisions of the employment agreement;
> (5) Ms. Bowers is arrested, indicted, or charged with a crime; or
> (6) Ms. Bowers is found to have taken, used, or converted any property belonging to Foto-Wear.

(Id. art. VII)  According to Ms. Bowers, the occurrence of any of these "events" or her failure to perform her duties under Article II of the contract[9] were the only situations that would constitute cause for Foto-Wear to terminate her employment.  (Pl.'s Br. Opp. & Reply Br. (Dkt. Entry 94-1) at 2-3.)

---

[8]  The Supreme Court of New Jersey clarified, "[i]t is only after the meaning of the contract is discerned that the parol evidence rule comes into play to prohibit the introduction of extrinsic evidence to vary the terms of the contract."  Conway, 901 A.2d at 347 (citing Atlantic Northern Airlines v. Schwimmer, 96 A.2d 652, 657 (N.J. 1953)).

[9]  The employment contract requires that Ms. Bowers devote "her full-time and best efforts to soliciting sales" on behalf of Foto-Wear.  (Employment Contract, Pl.'s Mot. Summ. J. (Dkt. Entry 68) art. II.)

Defendants have a different interpretation of what constituted cause for termination. According to Defendants, Article VII only lists the "exemplary situations" when the contract became "null and void."  (Defs.' Br. Supp. & Br. Opp. (Dkt. Entry 82) at 2.)  They argue that the for cause termination provision encompassed all common law reasons for terminating a for cause employment agreement, including legitimate business reasons.  (Id. at 2-16.)  Foto-Wear asserts that its poor financial position constituted cause for terminating the employment agreement.  (Id.)

I find that the meaning of "cause" in the employment contract is reasonably susceptible to both parties' interpretations.  As suggested by Ms. Bowers, the contract can be reasonably read to limit the causes of termination to the situations listed under Article VII or Ms. Bowers' failure to perform her duties under Article II.  It is particularly notable that many of the events listed in Article VII for terminating the agreement correspond with accepted common law causes for termination.  See, e.g., 19 Richard A. Lord, Williston on Contracts § 54:43 (4th ed. 2006) (noting that an employee may be terminated for cause if the employee violates company policy, participates in criminal activity, or embezzles company funds).  It would be not make sense for the parties to specify in Article VII events for termination if they had already intended that all grounds constituting good cause for termination under common law were to apply.  See Cumberland County Improvement Auth. v. GSP Recycling Co., 818 A.2d 431, 438 (N.J. Super. Ct. App. Div. 2003) (observing that a contract "should not be interpreted to render one of its

terms meaningless").

Moreover, there is extrinsic evidence that Ms. Bowers sought guarantees regarding her pay and the length of her employment during contract negotiations.  (Ms. Bowers' Aff., Pl.'s Mot. Summ. J. Ex. 1 (Dkt. Entry 68) ¶¶ 26-28; Ms. Bowers' Supp. Aff., Pl.'s Mot. Summ. J. Ex. 2.1 (Dkt. Entry 96-2) ¶¶ 2.33-2.38).  This extrinsic evidence, showing a compelling motive on Ms. Bowers' part to guarantee income in light of her leaving secure employment with a major corporation, is plainly relevant in determining the parties' intent.  See Conway, 901 A.2d at 347 (observing that courts may consider extrinsic evidence to effectuate the intention of the parties).)  Ms. Bowers also agreed to alter the commission schedule to receive guaranteed earnings in lieu of potentially greater pay after learning that Foto-Wear's business position was not as strong as initially represented by Mr. Sechrist.   (Pl.'s Mot. Summ. J. Ex. 2.1 (Dkt. Entry 96-2) ¶¶ 2.48-2.53).  "Where ambiguity exists, the subsequent conduct of the parties in the performance of the agreement may serve to reveal their original understanding."  Michaels, 140 A.2d at 204.  This extrinsic evidence, when considered in connection with the contractual provision stating that the contract "shall <u>bind</u> the company to pay the employee for the full two-year (2) term of this contract unless the employee terminates the contract voluntarily," (Employment Contract, Pl.'s Mot. Summ. J. Ex. 3 (Dkt. Entry 68) art. III (emphasis added)), suggests that the parties intended to narrow the scenarios when Foto-Wear could terminate the contract to avoid payments to Ms. Bowers to those situations where she was at fault for

13

disrupting the employment relationship, like the events listed in Article VII.  Thus, the contract

can be reasonably read to limit the causes for termination.

On the other hand, the contract can also be reasonably read to incorporate common law

reasons for terminating a for cause employment relationship.  As previously stated, the contract

does not define cause for terminating the agreement.  Generally, the terms of an agreement

"are to be given their plain and ordinary meaning" unless the circumstances indicate otherwise.

M.J. Paquet, Inc. v. N.J. Dept. of Transp., 794 A.2d 141, 152 (N.J. 2002).  A reasonable jury

could conclude that the parties intended to adopt the ordinary meaning of cause for termination.

If so, the meaning of "cause" for terminating the employment contract would be defined by the

common law, which recognizes legitimate business or financial reasons.  See, e.g., Linn v.

Beneficial Commercial Corp., 543 A.2d 954, 957 (N.J. Super. Ct. App. Div. 1988).[10]  Because

there exists two reasonable alternative interpretations of the meaning of cause for Foto-Wear to

terminate the employment contract, the contract is ambiguous.

Both parties claim that they are entitled to summary judgment even if the contract is

ambiguous.  Ms. Bowers argues that she is entitled to summary judgment because she was

fired solely for refusing to renegotiate her employment contract, which is not an acceptable

_____

[10]   The Linn court specifically held "that an action for wrongful discharge does not
generally lie for one whose loss of work is actuated by elimination of the job itself due to
legitimate economic or business reasons, and not as a bad faith pretext to arbitrarily terminate
the employee."  543 A.2d at 957 (emphasis added).

14

cause for terminating a for cause employment agreement.  Defendants, however, have

presented sufficient evidence from which a jury could conclude that Foto-Wear terminated Ms.

Bowers' contract based on economic hardship, not simply because she refused to agree to

different terms.

Defendants contend that they are entitled to summary judgment because New Jersey

case law recognizes that "all legally-permissible grounds for terminating an at-will employee are

available for terminating someone employed under an employment contract unless the contract

expressly provides to the contrary."  (Defs.' Br. Supp. & Br. Opp. (Dkt. Entry 82) at 10.)

Defendants rely on Ricci v. Corporate Express of The East, Inc., 779 A.2d 1114 (N.J. Super.

Ct. App. Div. 1988), as support for their argument.  (Defs.' Br. Supp. Mot. Summ. J. (Dkt. Entry

82) at 13.)  In Ricci, an employee was fired after writing a letter to a company supervisor critical

of the company's management practices.  Id. at 1117.  The employee and the employer had

executed an employment contract that set forth express causes for firing the employee.  Id. at

1116-17.  The employer in Ricci argued that the plaintiff's acts were insubordination and

constituted "misconduct . . . injurious to the Company" under the employment contract's

termination provision.  Id. at 1118.  Insubordination, though, was not expressly defined in the

employment contract in Ricci.  Id.  The court, however, "assum[ed] for purposes of argument

that its presence [was] implicit" in the contract, but determined that the defendant's acts did not

constitute insubordination.  Id. (emphasis added).  The court also found that the termination

15

was arbitrary under the common law.  Id. at 1118-1119.

Defendants argue that the court's consideration of the common law indicates that New Jersey courts will always look to the common law when an employment contract does not expressly identify a specific ground for termination that is regarded as "good cause" under the common law.  (Defs.' Br. Supp. & Br. Opp. (Dkt. Entry 82) at 13.)  Thus, according to Defendants, Foto-Wear could terminate Ms. Bowers' employment agreement based on financial distress, as the parties did not expressly address whether Foto-Wear could fire Ms. Bowers based on this common law ground for terminating a for cause employment contract.

Defendants' reliance upon Ricci for this proposition is unsound.   In Ricci, the court's inquiry was primarily focused on whether the employee's conduct constituted "misconduct injurious to the Company" as set forth in the contract provision detailing causes for termination. Id. at 1118-1119.  The court did not consider whether other common law causes for termination applied.  Indeed, such an analysis would violate the well-established principle of contract law that courts should enforce the intentions of the parties unless they are contrary to public policy. Twin City Pipe Line Co. v. Harding Glass Co., 283 U.S. 353, 356-57 (1931); Vasquez v. Glassboro Service Ass'n, 415 A.2d 1156, 1162-66 (N.J. 1980).  This is made clear in Linn, where the court stated that a company may fire an employee based on financial distress, "[a]bsent an express or implied promise to the contrary."  Linn, 543 A.2d at 957 (emphasis added).

16

As discussed above, the employment contract is ambiguous as to whether the parties intended to remove economic distress as a legitimate cause for Foto-Wear to terminate Ms. Bowers' employment.  This ambiguity is not amenable to resolution on the record before the Court.  Instead, a jury must decide whether the parties intended to allow economic distress to serve as a cause for terminating the employment agreement.[11]

### C.  Count II - WPCL Claim

Ms. Bowers' second claim is that Foto-Wear and the Officer Defendants violated the WPCL by failing to pay her commission and accrued benefits after terminating her employment on January 9, 2003.  Defendants contend that the WPCL only applies to "earned" or "vested" compensation.  (Def.'s Br. Supp. & Br. Opp.  (Dkt. Entry 82) at 21-26.)  According to Foto-Wear, Ms. Bowers did not "earn" her March 13, 2003, commission or post-termination benefits under the WPCL, because they were not due when she was fired.

---

[11]Defendants also suggest that financial distress rendered performance under the contract impracticable.  (Defs.' Br. Supp. & Br. Opp. (Dkt. Entry 82) at 12 (citing Brunner v. Abex Corp., 661 F. Supp. 1351, 1355 n.3 (D.N.J. 1986).)  The doctrine of impracticability is not applicable in this case.  First, a party cannot claim impracticability if the language or circumstances indicate that the party's duty would not be discharged.  See Restatement (Second) of Contracts § 261 (1979).; see also M.J. Paquet, Inc. v. N.J. Dept. of Transp., 794 A.2d 141, 148-49 (N.J. 2002) (discussing the doctrine of impracticability and relying on the Restatement (Second) of Contracts § 261).  As discussed above, it is ambiguous whether the language or circumstances indicate that Foto-Wear was bound to pay Ms. Bowers while facing financial distress.  Moreover, the factual record is inadequate to show that Foto-Wear could not perform its duties.  See id. cmt. b (noting that "mere market shifts or financial inability do not usually effect discharge" under the doctrine of impracticability).

The WPCL "provides employees a statutory remedy to recover wages and other benefits that are contractually due to them." Oberneder v. Link Computer Corp., 696 A.2d 148, 150 (Pa. 1997). Under the WPCL, an employee's "wages or compensation <u>earned</u> shall become due" upon termination of the employment relationship. 43 P.S. § 260.5(a) (emphasis added). The contract between the parties governs in determining whether wages or compensation are "earned." Weldon v. Kraft, Inc., 896 F.2d 793, 801 (3rd Cir. 1990).

Under the replacement commission schedule,[12] Ms. Bowers "<u>shall</u> receive a commission paid annually on the anniversary date of employment (for purposes of this agreement, March 13, 2002 and March 13, 2003)."  (Pl.'s Mot. Summ. J. Ex. 4 (Dkt. Entry 68) (emphasis added).) The contract is silent regarding what should happen if Ms. Bowers' employment is terminated prior to payment of the annual commission.  Thus, this case is distinguishable from cases involving employment contracts that clearly treat the matter of contingent compensation upon termination of the employment relationship.  See Stebok v. American General Life and Acc. Ins. Co., 715 F. Supp. 711, 713 (W.D. Pa. 1989).

---

[12] During oral argument on the parties' cross motions for summary judgment conducted on June 2, 2006, I rejected Defendants' argument that Ms. Bowers' replacement commission schedule was unenforceable for lack of consideration.  Specifically, I found that Ms. Bowers provided consideration for the schedule by agreeing to take a fixed commission payment rather than a potentially larger commission payment based on sales.  Furthermore, Ms. Bowers agreed to yearly commission payments rather than quarterly payments, which allowed Foto-Wear greater time to pay her commission.

Analysis of Ms. Bowers' commission payment is complicated by its unorthodox structure.  In most sales commission cases, the disputed commissions are based on identifiable sales.  In these cases, courts typically hold that the WPCL applies to commissions generated from sales completed before an employee's termination, but not to sales completed after the employee's termination.  See Sendi v. NCR Comten, Inc., 619 F. Supp. 1577, 1579 (E.D. Pa. 1985) ("Plaintiff clearly has no right under the [commission] Plans to receive commissions on sales made after his termination."); Hirsch v. Bennett, No. CIV.A.90-1076, 1991 WL 75200, at *3 (E.D. Pa. May 1, 1991) (granting summary judgment against a wrongfully terminated employee for sales commenced after his termination).

In this case, Ms. Bowers was to receive "½% of all sales with a minimum total compensation (base salary plus commission) of $225,000, which in this case shall also equal the ceiling or cap."  (Replacement Commission Schedule, Pl.'s Mot. Summ. J. Ex. 4 (Dkt. Entry 68).)  Thus, despite ostensibly being tied to sales, Ms. Bower's commission has no relation to any particular sales.  As such, the "commission" is more accurately regarded as a guaranteed wage payment.[13]

---

[13]  If analyzed as a commission, the trier-of-fact would have to determine what portion of the commission was earned before Ms. Bowers' termination, regardless of the validity of the termination.  See Hirsch, 1991 WL 75200, at *3 (explaining that a wrongfully terminated employee only has a valid WPCL claim for wages and commissions earned before termination; expected remaining wages and commissions may only be recovered under contract law); see also Gardner v. Beasley FM Acquisition Corp., No. CIV.A.97-2900, 1997 WL 325794, at *4

(continued...)

19

The issue, therefore, is when did Ms. Bowers' right to the commission vest.  In

McGough v. Broadwing Communications, Inc., 177 F. Supp. 2d 289 (D.N.J. 2001) (applying the

WPCL), the court held that the plaintiffs were not entitled to management bonuses that became

due after their termination.  Id. at 298.  The management bonuses required the plaintiffs to be

"active employee[s]" on a set date.  Id.  The Court decided that the plaintiffs were not entitled to

the bonuses because they were not "active employees" on the established date.  Id.

Unlike McGough, Ms. Bowers' commission payment does not require her to be an active

employee.  Instead, it seems to based on her fulfilling her duties under the employment

contract.[14]  This case, therefore, is more analogous to the situation in Riseman v. Advanta

Corp., No. 98-CV-6671, 2001 WL 1175126 (E.D. Pa. Sept. 12, 2001), aff'd in part, vacated in

part on other grounds, 39 Fed. Appx. 761 (3rd Cir. 2002), where a wrongfully terminated

employee sought "to recover bonuses for work that was already substantially performed when

[defendant] breached its part of the bargain."  Id., at *13 n. 19.  The Court held that "a jury could

conclude that when [the defendant unlawfully terminated the plaintiff] and breached its bonus

agreements, [plaintiff] had a vested contractual entitlement to bonuses for work already

---

[13](...continued)
(E.D. Pa. June 6, 1997) (holding that the WPCL allows an employee to state a claim for wages
earned before termination, not after, and any argument that post-termination wages became
due under an anticipatory breach argument is not supported by the WPCL); Barsky v. Beasley
Mezzanine Holdings, No. 04-1303, 2004 WL 1921156, at *2 (E.D. Pa. Aug. 30, 2004) (same).

[14]  Presumably, Ms. Bowers would not be entitled to the commission payments if she
shirked her duties immediately after agreeing to the commission schedule.

performed – not merely a contractual expectation to earn wages in the future.[15] Id. at *13

(citing Regier v. Rhone-Poulenc Rorer, Inc., Civ. A. No. 93-4821, 1995 WL 395948, at *8 (E.D.

Pa. June 30, 1995), aff'd, 92 F.3d 1172 (3d Cir. 1996)).

Likewise, Ms. Bowers had substantially performed her obligations when Foto-Wear

terminated her employment.  The record indicates Ms. Bowers worked extremely long hours in

her efforts to make Foto-Wear a success.  Indeed, Foto-Wear admits that it terminated Ms.

Bowers' employment because of economic reasons, not because Ms. Bowers failed to perform

her obligations.  A reasonable jury could conclude that Ms. Bowers had a vested entitlement to

the commission payment based on the work she had already performed.  As recognized by

Judge Brody in Riseman, whether a discharged employee has "earned" a bonus or commission

where the employment relationship is terminated before payment becomes due is a question

for the jury.  .[16]  Id.  Neither party, therefore, is entitled to summary judgment.

Ms. Hare, Mr. Jetter, and Mr. Sawchak also moved for summary judgment on the

grounds that they cannot be found individually liable under the WPCL.  Under the WPCL, "any

---

[15] In affirming the district court on this point, the Third Circuit observed that "[t]he mere fact that certain compensation is not payable until a future date is not necessarily fatal to a WPCL claim so long as the employee is deemed to have 'earned' it during his employment."  39 Fed. Appx. at 765.

[16] In affirming the district court on this point, the Third Circuit observed that "[t]he mere fact that certain compensation is not payable until a future date is not necessarily fatal to a WPCL claim so long as the employee is deemed to have 'earned' it during his employment."  39 Fed. Appx. at 765.

agent or officer" of a corporation may be held liable for an employee's unpaid wages or compensation.  International Ass'n of Theatrical Stage Employees v. Mid-Atlantic Promotions, Inc., 856 A.2d 102, 105 (Pa. Super. Ct. 2004) (noting that the purpose of the WPCL is to guarantee that employer's pay the earned compensation of employees and that employers are more likely to meet this obligation "if personal liability is imposed on the persons who make [compensation payment] decisions").  "To hold an 'agent or officer' personally liable for unpaid wages, 'evidence of an active role in decision making is required.'" Id. (quoting Mohney v. McClure, 568 A.2d 682 (Pa. Super. Ct. 1990)).

In Mohney, an employee sought unpaid wages from a bankrupt employer's corporate counsel and secretary.  568 A.2d at 685.  The secretary owned corporate stock, took minutes at each meeting of the corporation, and had authority to sign checks on behalf of the corporation.  Id. at 685-86.  The court nonetheless determined that the secretary was not liable under the WPCL because he was not "involved in the policy-making decisions" of the defendant corporation.  Id. at 686 (noting that the evidence did not indicate that defendant "actively participated in decisions or gave advice regarding pay or compensation.")

The International Association court reaffirmed that "status as a corporate officer or shareholder and of check-writing authority . . . is not necessarily dispositive of a party's status as an "employer" under the WPCL."  856 A.2d at 106.  An officer may be liable under the WPCL if the officer "undertook responsibility 'as a contracting party for the payment of wages in return

for labor as a policy-making officer or as an interested owner.'" Id. at 106-07 (quoting Mohney, 568 A.2d at 686).

Ms. Bowers claims Ms. Hare is liable under the WPCL because she "had a role to control records and deal with company assets - the patents.  She participated in hiring meetings and was on the payroll as an officer."  (Pl.'s Br. Opp. & Reply Br. (Dkt. Entry 94) at 46.)  Only the fact that Ms. Hare "participated in hiring meetings" would seem to indicate that she had a policy-making role to warrant liability under the WPCL.  Ms. Bowers, however, does not cite to evidence in the record showing that Ms. Hare participated in hiring meetings.

Defendants, on the other hand, cite Ms. Hare's deposition testimony, which demonstrates that she had no active role in the decision to hire Ms. Bowers or the drafting of Ms. Bowers' contract.  Nor was she involved with the payment of commissions to employees. Moreover, Ms. Hare was not even aware she was a named officer of Foto-Wear.  (Exhibits to Defs' Mot. Summ. J., L. Hare Dep. Tr, Dkt. Entry 79-2, at 18-29.)  Based on this evidence, a reasonable jury could not determine that Ms. Hare was a policy-making officer at Foto-Wear to warrant liability.

Mr. Jetter's duties appeared to be limited to interacting with customers.  However, it seems that he recommended the hiring of Ms. Bowers, though it is unclear whether he actually participated in the decision to hire her.  (See Pl's App. (Dkt. Entry 68-3) at 216.)  There does not appear to be any evidence in the record that he had a role in contracting with or firing Ms.

23

Bowers.  Under these circumstances, a reasonable jury could not find that he exercised policy-making decisions sufficient to warrant liability under the WPCL.

Mr. Sawchak is the current President of Foto-Wear.  Neither party disputes that he is currently involved in the policy-making decisions of the corporation.  Mr. Sawchak, though, was not President of Foto-Wear until after Ms. Bowers' termination.[17]  Plaintiff has not cited any authority holding liable a person who became an officer of the employer after the liability-creating events transpired.  Thus, Mr. Sawchak should not be liable to Ms. Bowers, as he had no role in the policy-making decisions during her employment.

Because Ms. Bowers failed to present sufficient evidence that Ms. Hare Mr. Jetter, or Mr. Sawchak participated in policy-making decisions during her employment to warrant liability under the WPCL, they will be dismissed from this action.

### D.  Counts III & IV - Ms. Bowers' Rights to Overtime Wages

During oral argument on the parties' cross motions for summary judgment conducted on June 2, 2006, I previously granted Defendants' request for summary judgment on Plaintiff's claims that Foto-Wear and the Officer Defendants violated the FLSA and the Pennsylvania

---

[17]  Ms. Bowers argues that Mr. Sawchak should be held liable under the WPCL because he was acting President when her commission payment became due in March 2003, and he did not honor the corporation's obligation to pay her commission.  Mr. Sawchak claims he was not President until May 2003.  Ms. Bowers asserts that records indicate that he was President on April 9, 2003.  Ms. Bowers, though, does not present any evidence that Mr. Sawchak was acting as President in March of 2003, when her commission became due.

MWA by failing to pay her overtime wages.  In particular, I found that, as a matter of law, Ms.

Bowers was exempt from both acts as an administrative employee.  See 29 U.S.C. § 213(a)(1);

43 Pa. Stat. Ann. § 333.105(5).  Judgment will be entered accordingly.

### E. Count V - The Retaliation Claim

Ms. Bowers alleges that Defendants unlawfully terminated her employment in retaliation

for her complaining about Foto-Wear's noncompliance with wage laws.  (Am. Compl. (Dkt.

Entry 27) ¶ 66.)  Ms. Bowers asserts two theories for her retaliation claim: (1) she was

terminated in retaliation for informally complaining that Foto-Wear was not complying with wage

payment laws, and (2) Foto-Wear refused to pay her post-termination commission and benefits

because she had filed a post-termination complaint with a state administrative agency.  Foto-

Wear has moved for summary judgment, arguing that Ms. Bowers has presented no evidence

to contradict Foto-Wear's assertion that it fired her based on financial distress, not retaliatory

animus.  (Def.'s Br. Supp. & Br. Opp. (Dkt. Entry 82) at 30.)

I agree that Ms. Bowers has not presented sufficient evidence upon which to base a

reasonable conclusion that Foto-Wear's non-retaliatory reason for terminating her employment

was pretextual.  It is undisputed that Foto-Wear's revenue was decreasing when Ms. Bowers'

employment began.  (See Pl.'s Supp. SMF (Dkt. Entry 95) ¶ 2.53.)  As admitted in Ms. Bowers'

affidavit, Foto-Wear failed to timely pay her commission "as a result" of its declining financial

position.  (Ms. Bowers' Aff., Pl.'s Mot. Summ. J. Ex. 1 (Dkt. Entry 68) ¶¶ 49-50.)  Ms. Bowers

subsequently informed the company that it was in violation of wage payment laws.  (Pl.'s SMF

(Dkt. Entry 66) ¶ 71.)  The company asked Ms. Bowers if she could "renegotiate" her

commission because Foto-Wear could only pay her commission if "the company returned to

profitability."  (Email from Emil Calomino to Ms. Bowers, Pl's Mot. Summ. J. Ex. 7 (Dkt. Entry

68) (noting that the company was at risk of liquidation).)

The evidence is also clear that Foto-Wear was attempting to reduce expenses by

lowering employment compensation when it fired Ms. Bowers.  This policy was uniformly

applied to other Foto-Wear employees, who either agreed to salary reductions or were fired.

(Sechrist Dep., Pl.'s Mot. Summ. J. (Dkt. Entry 68-2) at 38-37.)  The company was still in

financial distress when it denied Ms. Bowers' demand to pay her post-termination commission

and benefits.  Ms. Bowers points to no facts that indicate that Foto-Wear was retaliating against

her for complaining that the company was in violation of wage payment laws, other than noting

that she did in fact make the complaints.  This evidence fails to undermine the consistent

evidence presented by Defendants that they terminated her employment based on financial

distress, not retaliation.  Defendants' motion for summary judgment on this count will therefore

be granted.

### F.  Count VI - The CEPA Claim

New Jersey's Conscientious Employee Protection Act , N.J. Stat. Ann. 34:19-1, *et seq.*

protects employees from retaliatory action by employers.  Ms. Bowers argues that this Act is

applicable because the contract specifies that "[t]he validity, interpretation, construction, and enforcement of this agreement shall be governed by the laws of the State of New Jersey." Foto-Wear contends that CEPA does not apply to disputes arising outside of New Jersey.

The choice of law provision in Ms. Bower's employment contract clearly limits it to contractual disputes.  (Pl.'s Mot. Summ. J. Ex. 3 (Dkt. Entry 68) art. X ("The validity, interpretation, construction, and enforcement of this agreement shall be governed by the laws of the State of New Jersey") (emphasis added).)  The provision, therefore, does not control whether a non-contract claim, such as a claim under CEPA, is actionable.  See In re Fineberg, 202 B.R. 206, 219 (Bkrtcy. E.D. Pa. 1996) ("[A] choice of law provision which is contained in a contract does not control claims which do not arise out of that contract.").

A federal court sitting in diversity applies the choice of law principles of the forum state. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496-97 (1941).  "Under Pennsylvania conflict of laws rules, the Court first examines whether the laws of the interested states conflict."  On Air Entm't Corp. v. Nat'l Indem., Co., 210 F.3d 146, 149 (3d Cir. 2000).  If the laws conflict, the Court must determine which state has the most significant contacts as they relate to the states' public policies underlying the issue in question.  Gen. Star Nat'l Ins. Co. v. Liberty Mut. Ins. Co., 960 F.2d 377, 379 (3d Cir.1992); Berrodin v. Medical Components, Inc., No. Civ.A.03-5572, 2004 WL 2260671, at *2 (E.D. Pa. Oct. 7, 2004).

Courts have determined that CEPA conflicts with the laws of Pennsylvania.  See

27

Berrodin, 2004 WL 2260671, at *2; Ballinger v. Delaware River Port Authority, 800 A.2d 97, 105-06 (N.J. 2002) (finding CEPA broader than Pennsylvania's whistle blower laws) . The issue, therefore, is which state has the most significant contacts with the dispute.

The only contact New Jersey has to this case is that Foto-Wear is incorporated in New Jersey.  Otherwise, all activity in this case took place in Pennsylvania: Ms. Bowers worked in Pennsylvania, the alleged misconduct in this case took place in Pennsylvania, and Foto-Wear's principal office is located in Pennsylvania.[18]  Accordingly, Pennsylvania law applies in this case and Ms. Bowers does not have a cause of action under CEPA.  See Norris v. Harte-Hanks, Inc., 122 Fed. Appx. 566, 569 (3rd Cir. 2004) (finding CEPA did not apply when employer's business and operations were located in Pennsylvania).  Because New Jersey's CEPA does not apply in this case, the claim will be dismissed.

An appropriate Order follows.

**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie
United States District Judge

---

[18]  It should be noted that Ms. Bowers is not a resident of New Jersey – she lives in New York.  Two of the named defendants, Mr. Sechrist and Mr. Jetter, presently reside in New Jersey, though it is unclear if they resided in New Jersey during Ms. Bowers' employment.

28

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LORIE R. BOWERS** | : | |
| **Plaintiff** | : | |
| **v.** | : | **3:CV-03-1137** |
| | : | **(JUDGE VANASKIE)** |
| **FOTO-WEAR, INC., DONALD S. HARE,** | : | |
| **TROY SECHRIST, LORRAINE L. HARE,** | : | |
| **PAUL D. JETTER, MARK S. SAWCHAK,** | : | |
| **Each Individually and as an Officer of** | : | |
| **Foto-Wear, Inc.** | : | |
| **Defendants** | : | |

## ORDER

**AND NOW, THIS 22nd DAY OF MARCH, 2007,** for the reasons set forth in the

foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1.  Plaintiff's Motion for Partial Summary Judgment (Dkt. Entry 64) is **DENIED**.

2.  Defendants' Motion for Summary Judgment (Dkt. Entry 79) is **GRANTED IN PART**

**AND DENIED IN PART**, as follows:

(a) The request for summary judgment by Foto-Wear concerning Plaintiff's

breach of contract claim (Count I) is **DENIED**.

(b) The request for summary judgment by Foto-Wear, D. Troy Sechrist, and

Donald Hare concerning Plaintiff's Pennsylvania Wage Payment and Collection

Law claim (Count II) is **DENIED**.

(c) The request for summary judgment by Lorraine Hare, Paul Jetter, and Mark

Sawchak concerning Plaintiff's Pennsylvania Wage Payment and Collection Law claim (Count II) is **GRANTED**.  Ms. Hare, Mr. Jetter, and Mr. Sawchak are dismissed from this action.

(d) The request for summary judgment by Defendants on Ms. Bowers' Fair Labor Standards Act (count III), Pennsylvania Minimum Wage Act (Count IV), retaliation (Count V), and New Jersey Conscientious Employee Protection Act (Count VI) claims are **GRANTED**.

3.  A telephonic scheduling conference will be conducted on **April 3, 2007, at 10:30 a.m.**  Attorney Neil Grover is responsible for placing the call to 570-207-5720, and all parties shall be ready to proceed before the undersigned is contacted.

**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie
United States District Judge

2